IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

PATRICIA CURRY                                                                   PLAINTIFF

VS.                                         CASE NO. 07-CV-1092

CONAGRA POULTRY COMPANY
and PILGRIM'S PRIDE, INCORPORATED                               DEFENDANTS

## MEMORANDUM OPINION

Before the Court is Defendants' refiled Motion for Summary Judgment. (Doc. No. 14). The Plaintiff has responded. (Doc. No. 18). Defendants have filed a reply to Plaintiff's response. (Doc. No. 22). The matter is ripe for consideration.

BACKGROUND

Patricia Curry is African-American. She is a former employee of Defendant ConAgra Poultry Company. Curry worked at the Defendant's chicken processing plant in El Dorado, Arkansas, on two separate occasions. In the late 1970's, Curry worked at the ConAgra plant for about a year. On August 28, 1996, Curry returned to work for ConAgra a second time. This time, she worked at the plant until October 14, 2002, when she took a one-year medical leave of absence. Curry was formally terminated on October 28, 2003, at the end of her medical leave.[1]

ConAgra maintained an anti-discrimination policy at the plant. The policy prohibited

---

[1] On or about November 24, 2003, Pilgrim's Pride purchased ConAgra Poultry Company and its processing plant in El Dorado. At the time of the acquisition, Curry was no longer employed by ConAgra. Therefore, Curry was never an employee of Pilgrim's Pride. Because of the acquisition, Pilgrim's Pride has been named a defendant in this action.

intimidation, harassment and hostile acts against its employees.  It provided a mechanism for reporting complaints.  Curry knew of this procedure and the company's confidential 1-800 hotline for reporting any work related problems.

Curry belonged to the United Food and Commercial Workers Union Local 2008. the Union at the plant.  She served as a Union steward for more than a year.  As a Union member, Curry could utilize the collective bargaining agreements' grievance procedure to file complaints about aspects of her employment, including any racial discrimination and/or harassment.  The grievance procedure consisted of four steps through which the complaining employee and the company would attempt to resolve the dispute.  If a resolution could not be reached after the third step, the employee could appeal the complaint to binding arbitration.  Curry was aware of the Union's grievance procedure.

During her second tenure at the plant, Curry worked in various departments and on different shifts.  In 1996, Curry started out on the "cone line" on the day shift.  On the cone line, Curry's duties rotated between placing the upper part of individual chickens on a cone and cutting the wings off these parts.  In April 1997, Curry requested and received a medical leave of absence.  Curry's LOA lasted seven days.  In September 1997, Curry transferred off the cone line because she was having problems with her hands.  The company nurse recommended her transfer.

Curry transferred to the plant's boneless breast packout department.  In this new position, Curry inspected boneless chicken breasts to ensure the absence of bones.  She then placed the inspected breasts on trays.  In September 1997, Curry requested and received another medical leave of absence.  This LOA lasted one week.  Curry remained in this position until 1998.

In June 1998, Curry bid on and received a job in the packer area of the boneless breast department. Curry remained in this position until 2001when she successfully bid for the job of a grader within the same department. In accepting this job, Curry transferred to the night shift.

In 2002, Curry successfully bid on a day shift job in the marination department. Curry then bid on and received another job in that same department. She remained in the marination department until October 2002 when she requested and received her third medical leave of absence.

Curry claims that during her second tenure with ConAgra, the Defendants ran a "slave farm" at the plant. In support of this contention, Curry points to the behavior of two of her Caucasian supervisors, Kenneth Hall and Ann Simmons.[2]

Curry claims that Kenneth Hall and other Caucasian supervisors used the words, "Ya'll" and "You people" when talking to Curry and other African-American employees. Curry contends that these words are racist. She also contends that the use of these words shows that these supervisors thought they were still in slavery times. Curry, however, never filed a grievance or complained to management about the use of these terms by Hall or any other supervisor. Curry admits that she was only offended when Caucasian supervisors used these words. She was not offended when her African-American lead person used the words, "You all" when talking to African-American employees.

Other than these two terms, Curry never heard Hall or any other Caucasian employee use

---

[2] During her second tenure, Curry was supervised by three Caucasian supervisors–Kenneth Hall, Ann Simmons and Buddy Wesson. She was also supervised by four African-Americans supervisors–Jack Hill, Vance Shepherd, Michael Duckworth and a woman named Elonra. Curry has no racial discrimination issues with any of her African-American supervisors.

any racially discriminatory language at the plant. Curry was never called the "N" word or other racial slur by any Caucasian employee at the plant. She also never heard the "N" word or other racial slur used by any Caucasian employees.

Next, Curry claims that on one occasion Ann Simmons showed "favoritism" to two Caucasian employees when they, along with Curry and other African-American employees, returned to work late after their break. When the group arrived late, Simmons told the whole group to go to the personnel office. The two Caucasian employees and some of the African-American employees refused to go, saying that they were not late. Curry, however, went to personnel as instructed. Curry does not know if any of the other African-American employees ever went to the personnel office or not. Curry never filed a grievance or complained to management about the incident. This is the only instance that Curry believes Simmons treated Caucasian employees more favorably than her.

Curry also claims that on one occasion Simmons gave Curry and all the other employees[3] on her side of the packout line a verbal warning for leaving too many bones in the boneless chicken breasts. The employees were told that they would be given a written warning if it happened again. Curry believes that Simmons was racist for giving her this verbal warning. Although, she admits that everyone on the line received the warning. Curry also admits that it is important that the chicken breasts have no bones in them if the company is selling them as boneless.

Finally, Curry claims that the walls of the bathroom were often defaced with sexual and racial graffiti. The graffiti never referred to Curry by name or threatened her physically. Curry

---

[3] All the employees on the line were African-American.

complained about the graffiti and the dirty condition of the bathroom to Angela Goodwin, a Union steward. After talking to Goodwin, the bathroom walls were painted. Curry admits that the bathroom was painted periodically.

During her second tenure at the plant, Curry suffered medical problems in connection with her hands, back and leg. As a result, she was placed on medical restrictions at work. Curry claims that during this time she was harassed because of her race.

In support of this contention, Curry claims that Dawn Taylor, a Caucasian nurse, was unprofessional in her treatment of her. Curry claims that Taylor, along with Curry's Caucasian and African-American supervisors, did not follow the medical protocol in regard to her injuries. She claims that despite her work restrictions, she was required to work on the line, was not allowed to put her leg up and was not allowed to ice pack her hands every so often. Curry claims that it was Taylor's job to see that her work restrictions were followed. Curry complained to management.[4] Thereafter, Taylor would come out on the floor to observe Curry to see that her work restrictions were being followed.

Curry states that she did not like Taylor's attitude or the way she talked. Curry claims that on one occasion in 2002, Taylor used the words "damn" and "shit" in her presence. Taylor said these words when she handed Curry a medical form to sign and Curry refused to sign it without first reading it. Curry also claims that Taylor grabbed the medical form out of her hand.

Curry also claims that after having at least four injuries at the plant, Taylor threatened her.

---

[4] It appears that Curry also filed a grievance during this time demanding to be paid for the day of June 18, 2002. In this grievance, Curry states that on that day Taylor sent her to personnel rather than assign her any light duty work as per the instructions from an emergency room doctor. The matter was settled and Curry was paid for the day.

Curry claims that Taylor did this by saying, "something will have to be done" because she was having so many on the job injuries. Curry states that she felt like Taylor was threatening to get her fired. Thereafter, Curry filed a grievance in regard to this alleged threat. The matter was investigated by the company. Taylor denied threatening Curry stating that she told Curry that she would have to find her a safer place to work if the accidents continued. The matter was settled.

On October 14, 2002, Curry requested and received a medical leave of absence. Her LOA lasted one year. During this time, Curry received disability benefits from ConAgra. After being absent from work a little over a year, Curry was formally terminated on October 28, 2003.

On December 22, 2003, Curry, along with seven other employees, filed a class action lawsuit against ConAgra and Pilgrim's Pride.[5] In the Class Action Complaint, Curry alleged that she had been subjected to racial discrimination at the El Dorado plant. She claimed that the discrimination was in the form of disparate treatment, wrongful termination, failure to promote and a hostile work environment in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993 ("ACRA").

On November 9, 2005, the Defendants moved for summary judgment on all of Curry's claims. On March 28, 2006, the Court granted summary judgment on Curry's § 1981 claims for disparate treatment, wrongful termination and failure to promote. It also granted summary judgment on all her claims made pursuant to the ACRA. Summary judgment was denied as to Curry's § 1981 claim for hostile work environment on the grounds that merits-based discovery had not begun. The Court ruled that the motion was premature. It also ruled that it could be

---

[5] By this time, Pilgrim's Pride had purchased ConAgra Poultry Company and its chicken processing plant in El Dorado.

...

refiled at a later date.

On May 15, 2007, the Court denied the Plaintiffs' Motion for Class Certification. Thereafter, the parties agreed that each class representative would proceed with their individual claims in separate lawsuits under newly assigned case numbers. The parties also agreed that no additional discovery was needed and that the Defendants could refile their previously filed summary judgment motions against the individual plaintiffs.

On September 19, 2007, Curry filed her individual Complaint against the Defendants. On November 2, 2007, Curry amended the Complaint. In her Amended Complaint, Curry alleges that the Defendants discriminated against her because of her race in violation of 42 U.S.C. § 1981. Specifically, she claims that she was subjected to a hostile work environment. The matter is now before the Court on Defendants' refiled Motion for Summary Judgment.

## STANDARD OF REVIEW

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment;

> The judgment sought shall be rendered forthwith if the pleadings, dispositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Krenik v. County of LeSueur,* 47 F.3d 953 (8th Cir. 1995). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial–whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 250 (1986).  *See also Agristor Leasing v. Farrow,* 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund,* 800 F.2d 742, 746 (8th Cir. 1986).  A fact is material only when its resolution affects the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248.  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  *Id.* at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996).  The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Id.*  The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of LeSueur,* 47 F.3d at 957.  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256.

DISCUSSION

In her Amended Complaint, Curry alleges that she was subjected to a hostile work environment when she was subjected to abusive language at the plant, witnessed racial graffiti on the bathroom walls and witnessed African-American employees being treated differently than Caucasian employees in that African-Americans were treated in a disrespectful manner.  She claims that this discrimination was in violation of 42 U.S.C. § 1981.

In employment discrimination cases under 42 U.S.C. § 1981, the courts apply the familiar

8

three-step burden shifting framework set out in *McDonnell Douglas Corp. v. Green,* 41 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Putman v. Unity Health Sys.,* 348 F.3d 732, 735 n.2 (8th Cir. 2003)(applying *McDonnell Douglas* to § 1981 claim). Under *McDonnell Douglas,* the plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff is able to do this, the burden of production then shifts to the defendant to assert a legitimate non-discriminatory reason for the alleged discrimination. If the defendant sets forth such a reason, the burden then shifts back to the plaintiff to establish that the asserted reason was merely a pretext for discrimination. The Court will review each of Curry's claims in light of the above burden shifting framework.

      Curry claims that she was subjected to a hostile work environment during her second tenure at the plant. In order to establish a racially hostile work environment claim, an employee must show that: 1) she was a member of a protected group; 2) she was subjected to unwelcome race-based harassment; 3) the harassment was because of her membership in the protected group; and 4) the harassment affected a term, condition, or privilege of her employment. *Elmahdi v. Marriott Hotel Services, Inc.,* 339 F.3d 645 (8th Cir. 2003). Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment. *Elmahdi,* 339 F.3d. at 652. The conduct must be severe "as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Id.* (quoting *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir. 1998)). Merely feeling offended, however, does not sufficiently affect the conditions of employment to support a claim. *Id.,* 339 F.3d at 653 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). In determining whether sufficient evidence of a hostile work environment claims has been presented, courts consider all the attendant

circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Elmahdi,* 339 F.3d. at 652-53. To satisfy the high threshold of actionable harm, the employee must show that his workplace was permeated with discriminatory intimidation, ridicule and insult. *Elmahdi,* 339 F.3d. at 653.

*Abusive Language at the Plant*

Curry claims that she was subjected to a hostile work environment by the Defendants when she was subjected to abusive language at the plant. There is no doubt that Curry is a member of a protected group–African-American. Thus, she can establish the first element of her *prima facie* case of hostile work environment. However, the Defendants contend that Curry can not show the other elements of her *prima facie* case–that she was subjected to unwelcome race-based harassment, that the alleged harassment was because of her membership in the protected group and that it affected a term, condition, or privilege of her employment.

Curry does not contend that she was ever called the "N" word or any other racial slur by any Caucasian employees at the plant. In fact, she never heard the "N" word or any racial slurs used by any Caucasian employee. Rather, Curry states that Kenneth Hall and other Caucasian supervisors used the words "Ya'll" and "You people" when talking to her and other African-American employees. Curry contends that these words are racist. However, she admits that she was not offended when her African-American lead person used the term "You all" when speaking to African-American employees.

There is nothing inherently racial about the terms, "Ya'll, "You peole" and "You all." The terms are racially neutral. In this case, the terms were used by both African-American and

Caucasian supervisors at the plant and were directed to both African-American and Caucasian employees. There is no evidence that a supervisor's use of these terms was motivated by or based upon the employee's race. No reasonable person could attribute any racial animus to their use in this case. The use of these terms by Curry's supervisors did not subject her to unwelcome race-based harassment and did not affect a term or condition of her employment. Thus, they are not sufficient to support her claim of a hostile work environment.

Next, Curry claims that Nurse Dawn Taylor was unprofessional. In support of this claim, Curry points to Taylor's use of the words "damn" and "shit" in her presence. Taylor said these words when she was upset at Curry for not signing a medical form Taylor had given her. This is the only occasion that Taylor used these words in Curry's presence.

There is nothing inherently racial about the words "damn" and "shit." There is no evidence that Taylor's use of these words was motivated by Curry's race. *See Schoffstall v. Henderson,* 223 F.3d 818, 826 (8th Cir. 2000). Also, the use of these words on this one isolated occasion is not so severe or pervasive as to affect a term or condition of Curry's employment. Thus, they are not sufficient to support her claim of a hostile work environment.

The discrimination laws are not a general civility code. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 786-88 (1998). Thus, the abusive language of which Curry complains is not what a reasonable person would consider harassment. It was not severe or pervasive enough to amount to a discriminatory change in the terms and conditions of her employment. Thus, Curry has failed to establish a *prima facie* case of hostile work environment in connection with abusive language at the plant. Accordingly, the Court finds that this claim must fail as a matter of law.

*Racial Graffiti in the Bathroom*

Next, Curry contends that the presence of racial graffiti on the bathroom walls at the plant created a hostile work environment for her. She complained about the graffiti and the dirty condition of the bathroom to Angela Goodwin, a Union steward. After talking to Goodwin, the bathroom walls were painted. Curry also admits that the bathroom was painted periodically.

In this instance, the graffiti was not specifically directed at Curry. It did not physically threaten her. There is no evidence that it affected her ability to do her work. It was painted over by the Defendants. It is apparent that the presence of graffiti on the walls in the plant's bathroom was not sufficiently severe or pervasive enough to affect the terms and conditions of Curry's employment. *See Woodland v. Joseph T. Ryerson & Son, Inc.,* 302 F.3d 839, 843-44 (8th Cir. 2002). Thus, she has failed to establish a *prima facie* case of a hostile work environment in connection with the presence of graffiti in the bathroom. Accordingly, the Court finds that this claim must fail as a matter of law.

*African-American Employees treated Disrespectfully*

Curry claims that she was subjected to a hostile work environment when she witnessed African-American employees being treated differently than Caucasian employees in that they were being treated in a disrespectful manner. However, Curry has produced no evidence showing how African-American employees and Caucasian were treated differently at the plant in terms of respect. Curry's bare allegation of African Americans being treated in a disrespectful manner is insufficient to support her claim of a hostile work environment. *See Bradley v. Widnall,* 232 F.3d 626, 630 (8th Cir. 2000). Thus, she has failed to establish a *prima facie* case of hostile work environment in this regard. Accordingly, the Court finds that this claim must fail as

a matter of law.

Finally, Curry claims that her treatment by Dawn Taylor, the company nurse, and Ann Simmons, her Caucasian supervisor, created a hostile work environment for her. Curry claims that Taylor's conduct toward her was unprofessional, she did not follow or enforce her medical protocol, and she threatened her because Curry had too many on the job injuries. Curry also claims that Simmons showed favoritism when Curry went to personnel as instructed by Simmons and two Caucasian employees and several African-American employees did not.

There is no evidence that the alleged harassment by Taylor or Simmons was motivated by Curry's race. Without such evidence, Curry may only speculate that the alleged mistreatment was based on race. Such speculation is insufficient to support her claim of hostile work environment. *See Palesch v. Mo. Comm'n on Human Rights,* 233 F.3d 560, 566-68 (8th Cir. 2000). Thus, Curry has failed to establish a *prima facie* case of hostile work environment in this regard. Accordingly, the Court finds that this claim must fail as a matter of law.

## CONCLUSION

For the reasons discussed herein above, the Court finds that the Defendants' Motion for Summary Judgment should be and hereby is **granted**. A judgment of even date, consistent with this Opinion, will be issued.

IT IS SO ORDERED, this 30th day of September, 2008.

    /s/Harry F. Barnes  
    Hon. Harry F. Barnes  
    United States District Judge

14